UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO.: ~~17-150~~  19-153 |
| v. | * | SECTION: ~~"B"~~  "D" |
| JORDY ROBERTSON | * | VIOLATIONS: 21 U.S.C. § 841(a)(1) |
| | | 21 U.S.C. § 841(b)(1)(C) |
| | * | 18 U.S.C. § 3571(d) |

\* \* \*

## FACTUAL BASIS

The above-named defendant, **JORDY ROBERTSON**, has agreed to plead guilty to Count One of the Bill of Information, in which he is charged with conspiracy to distribute a quantity of cocaine hydrochloride, and Count Two of the Bill of Information, in which he is charged with wire fraud. Should this matter have proceeded to trial, the United States of America would have proven beyond a reasonable doubt, through the introduction of relevant, competent, and admissible testimonial, physical and demonstrative evidence, the following facts to support the allegation against defendant **JORDY ROBERTSON ("ROBERTSON")**:

### Drug Trafficking Investigation

*Background of Drug Trafficking Investigation*

The Drug Enforcement Administration ("DEA") conducted a long-term drug trafficking organization starting in approximately May 2017 of **ROBERTSON** and others. The investigation revealed that **ROBERTSON** arranged to distribute quantities of cocaine hydrochloride to

Page 1 of 15

AUSA
Defendant
Defense Counsel

customers in the Eastern District of Louisiana, and that Porfirio GARCIA ("GARCIA") was **ROBERTSON**'s cocaine supplier.[1]

*ROBERTSON Provided Sample of Cocaine and Heroin to a Confidential Informant*

DEA utilized a cooperating defendant, ("CD-1") in its investigation of **ROBERTSON**. Specifically, on May 2, 2017, CD-1 received a text message from **ROBERTSON**, stating, "Be ready in a few...bout 40 mins." Moments later, **ROBERTSON**, texted CD-1, "I got it!!!" Later that day, CD-1 received a recorded incoming call from **ROBERTSON**, during which **ROBERTSON** told CD-1, "Hey I'm 'bout to pull up I want you to get in the car with me and take a ride with me," and CD-1 responded, "Alright." Based on prior conversations between CD-1 and **ROBERTSON**, **ROBERTSON** was referring to providing free samples of cocaine and heroin to CD-1 so that CD-1 could test the quality of the narcotics.

CD-1 met with **ROBERTSON** later that day. **ROBERTSON** and a then-unknown Hispanic male (whom DEA subsequently identified as GARCIA) met with CD-1 in Reserve, Louisiana. **ROBERTSON** arrived with GARCIA, who was in the passenger seat of the car. **ROBERTSON** parked, exited the vehicle, and met with CD-1. During that conversation, **ROBERTSON** told CD-1 that the other individual in the car (namely, GARCIA) was **ROBERTSON**'s supplier and asked if CD-1 wanted to meet with him. CD-1 declined at that time and stated that CD-1 would contact **ROBERTSON** later after CD-1 sampled the product. **ROBERTSON** then provided CD-1 with approximately 2.5 grams of cocaine hydrochloride, and 0.5 grams of heroin. Laboratory results confirmed the presence of cocaine and heroin and their approximate weights.

---

[1] GARCIA was charged with conspiracy to distribute narcotics in EDLA Case No. 18-cr-19 "F."

AUSA
Defendant
Defense Counsel

Two days later, on May 4, 2017, CD-1 and **ROBERTSON** agreed to meet at Chili's restaurant located at 1820 W. Airline Highway, LaPlace, Louisiana. DEA provided CD-1 with audio and video recording equipment. Agents observed a white Ford Fusion bearing Louisiana License YBH728 pull into the parking lot and park. This vehicle was registered in **ROBERTSON**'s name and address. During those audio/video recorded conversations, CD-1 told **ROBERTSON** that CD-1 was ready to meet with **ROBERTSON**'s supplier. **ROBERTSON** informed CD-1 that the supplier had "10" (meaning 10 kilograms) that he was trying to move. CD-1 told **ROBERTSON** that the sample was good quality, and **ROBERTSON** replied that CD-1 could "cut it" (i.e., dilute the drugs) multiple times. CD-1 said that he wanted to sit down with the supplier. **ROBERTSON** agreed. **ROBERTSON** stated that on one trip, the supplier went to Mississippi and picked up "90 grand."

*Attempted 3 Kilogram Transaction Between CD-1 and **ROBERTSON***

On May 11, 2017, **ROBERTSON** texted CD-1, "U going to be ready to do something today!!!! So I can get ready?" and CD-1 replied, "I should be I'm just getting off let check things out." **ROBERTSON** replied, "OK!!!! Jus don't wanna waste time or wait to late." CD-1 then sent text messages reading, "OK" and "Don't trip its all good." **ROBERTSON** responded, "As of last night theres only a few leftover!!! I jus talked to him it maybe 2-3 left but he's trying to get 30 and don't wanna go down. He said he's really selling them for 31-32 because it's not touched but he's going to cut the price as time goes on because he's bring it down to us." When **ROBERTSON** referred to "30," he was describing $30,000, which is consistent with the price of one kilogram of cocaine. When **ROBERTSON** referred to "2-3 left," he was telling CD-1 that his supplier, GARCIA, only had two or three kilograms of cocaine remaining.

Page **3** of **15**

AUSA
Defendant
Defense Counsel

Ultimately, this narcotics transaction was not completed, because another drug dealer, ("CD-2"),[2] told GARCIA not to deal with CD-1. According to CD-2, CD-2 knew CD-1, GARCIA, and **ROBERTSON**. CD-2 believed that CD-1 was cooperating with law enforcement. CD-2 reported to GARCIA that CD-1 was working with the police, and told GARCIA not to sell anything to CD-1. GARCIA informed CD-2 that Garcia then did not trust **ROBERTSON** and refused to provide controlled substances to either **ROBERTSON** or CD-1.

### *Interview of ROBERTSON*

On November 15, 2017, DEA and the St. John the Baptist Parish Sheriff's Office ("SJPSO") agents consensually interviewed **ROBERTSON**. **ROBERTSON** had previously contacted SJPSO regarding **ROBERTSON** hearing that he was a "snitch." Specifically, **ROBERTSON** was concerned about his reputation on the streets, and he wanted to meet in person to discuss the accusations of **ROBERTSON** acting as an informant for the police. That meeting occurred on November 15, 2017, in Metairie. **ROBERTSON** was not in custody during the interview, and was free to leave at any time.

During the course of the interview, **ROBERTSON** discussed his relationship with GARCIA, stating that he met GARCIA through another individual. **ROBERTSON** stated that he previously observed GARCIA in possession of kilograms of cocaine, and that Garcia offered to sell the kilograms to **ROBERTSON** for $30,000 per kilogram. During the interview, agents informed **ROBERTSON** that DEA had obtained a wiretap in 2016 of another drug trafficker, Troy KENDRICK, Jr.,[3] whom DEA believed to be **ROBERTSON**'s source of supply in 2016.

---

[2] CD-2 was later arrested by DEA and agreed to cooperate with law enforcement. At the time of this proposed three-kilogram transaction, CD-2 was not cooperating.
[3] KENDRICK was charged and convicted for conspiracy to distribute narcotics in EDLA Case No. 16-cr-163 "H."

**ROBERTSON** responded that a "few years ago, you guys had me, but I changed my life around, and I'm not in the game anymore because of my kid."

*Witness Intimidation*

DEA continued to investigate **ROBERTSON** for fraud, as discussed below. On October 24, 2018, DEA served **ROBERTSON** with a target letter. On November 7, 2018, **ROBERTSON** met with representatives from DEA and Assistant U.S. Attorneys from the United States Attorney's Office for the Eastern District of Louisiana ("USAO"), with his lawyer. At the meeting, DEA outlined the investigation to date, including both the wire fraud and drug investigations. Certain evidence, including the recordings made by CD-1, were shown to **ROBERTSON** and his attorney. Although the fact that CD-1 was an informant was not explicitly stated to **ROBERTSON**, the recordings effectively revealed that CD-1 was an informant working for DEA.

After the meeting, on January 25, 2019, agents reviewed a post on Facebook by an account utilized by **ROBERTSON**. **ROBERTSON** tagged two other individuals and stated, "I got mines and Yes that bitch ass nigga [CD-1] a (rat) all the real niggas gotta watch this DEA AGENT." Another individual asked, "Who is [CD-1?]" and "Where he from?" **ROBERTSON** said, "yes!!! I'm flooding the streets with it." **ROBERTSON** also replied by identifying the neighborhood in which CD-1 lives. Later, **ROBERTSON** repeated, "He's a DEA AGENT." In that same post, **ROBERTSON** posted a purported confidential informant number and the full name of CD-1 and CD-1's alias. **ROBERTSON** then posted a picture of two hands, painted black, making the sign of a gun, beneath the word "gun."

AUSA ___
Defendant ___
Defense Counsel ___

## Wire Fraud Investigation

*Background on Juvenile-1 and It Takes Lives to Save Lives*

**ROBERTSON** is the father of Juvenile-1, who is a local and national celebrity, and is a self-described fan of the New Orleans Saints football team. Juvenile-1 was born with a disease that required multiple liver transplants, and while he was in Ochsner Hospital in 2015, he met several Saints players and impressed them with his charisma. The Saints embraced Juvenile-1 as a fan, and as a result, he rose to local and then national attention, culminating in appearances on Good Morning America in late 2016 and winning the Jimmy V ESPY Award for Perseverance in July of 2017. **ROBERTSON** accompanied Juvenile-1 for all of these events, and starting around the time of the Good Morning America appearance, **ROBERTSON** began portraying himself as a fundraiser, first for Juvenile-1's own medical care, and then later for the cause of organ donation generally. As such, **ROBERTSON** founded a Louisiana Limited Liability Corporation, It Takes Lives to Save Lives LLC ("It Takes Lives"), which was established on or about November 17, 2016, around the time of the Good Morning America appearance.

It Takes Lives' website, ittakeslivestosavelives.com, described the company as a charity accepting donations to raise awareness for pediatric organ transplants. It Takes Lives also operated a GoFundMe online fundraising campaign, entitled "Help [Juvenile-1]." In some instances, It Takes Lives also accepted donations from individuals and organizations directly, outside of GoFundMe. Initially, the GoFundMe campaign was established to purportedly help pay for Juvenile-1's medical expenses related to his liver disease. However, both hospital billing records and Medicaid records demonstrated that Juvenile-1's medical expenses were paid by Medicaid, and **ROBERTSON** and his family did not in fact incur any medical expenses for Juvenile-1.

Subsequently, the GoFundMe campaign changed its purported charitable mission to raising awareness for organ transplants.

However, **ROBERTSON** did not utilize those donations to provide charitable services. Instead, funds donated to It Takes Lives were deposited into **ROBERTSON**'s personal bank account, or a corporate bank account over which **ROBERTSON** had sole control. **ROBERTSON** utilized the donated funds to purchase household goods, groceries, and other personal items. In addition, **ROBERTSON** also utilized money donated to It Takes Lives to withdraw large quantities of cash at casinos in the New Orleans metropolitan area to engage in gambling activities. While It Takes Lives described itself as a charity, it was not a 501(c)(3) nonprofit organization.

*GoFundMe Transactions*

**ROBERTSON** created the "Help [Juvenile-1]" GoFundMe campaign on October 18, 2016. Victim-1 helped **ROBERTSON** set up the GoFundMe campaign, and Victim-1 made a donation to the campaign, which Victim-1 submitted through GoFundMe's online platform. Victim-1 believed that the donations would be used to pay for Juvenile-1's medical expenses. That donation occurred on or about October 19, 2016, when Victim-1 was located in the New Orleans area, within the Eastern District of Louisiana.

An early version of the campaign description, posted on October 18, 2016, stated that "Any donation you could provide will all go towards [Juvenile-1]'s medical bills and make his current fight go as strong as possible." As shown by Medicare records and hospital records, this was false.

**ROBERTSON** later updated the GoFundMe campaign description to focus on organ donation awareness rather than Juvenile-1's medical bills. As it appeared on January 24, 2018, the campaign stated that Juvenile-1 was "still constantly pushing to save other kids lives like his." The

AUSA
Defendant
Defense Counsel

campaign stated that the charitable purpose of the organization was to "help educate others on the importance of becoming an organ donor and also help families who are going through hard times while they wait for a transplant." In addition, the campaign represented that donations would help increase the number of organ donors:

> I understand we can't provide a liver for someone unless it becomes available, **but what you can do is HELP me in any and every way possible to spread the word about others becoming organ donors.** I have a plan, but I cannot do it alone and without your help! I wish to bring this awareness to as many people as possible. Not just for [Juvenile-1], but for every single sick person that can only live by receiving some form of transplant – whether that be a liver, kidney or heart.
>
> I know if I can help someone else, then I stand a greater chance of my son continuing to get help and others receiving their gift of life like my son did. Your donations would give other kids the opportunity to live beyond their youth because our organization will keep spreading the word to help people. I've learned sooooo much from seeing my son suffer. I learned that I never want to see any other parent or person suffer like this.
>
> **Just think, one organ donor can save 9 lives by just saying YES!!** Thank you for your continued support as we keep [Juvenile-1's nickname] as healthy as possible and help as many others as we can.

(Emphasis in original)

Donations made on the GoFundMe campaign were distributed to **ROBERTSON** via a payment processor, WePay. In total, the GoFundMe campaign received $46,346 from over 100 separate donors. Records showed three donations of $1,000 or more, including a $1,000 donation on June 5, 2017, a $5,000 donation on July 13, 2017, and an $8,390 donation from Victim-2 on May 31, 2017. Victim-2 believed that the donation would be used to pay Juvenile-1's medical expenses or otherwise support Juvenile-1's quality of life. The WePay transfers went to **ROBERTSON**'s personal account at the Louisiana Federal Credit Union.

AUSA _JKS_
Defendant
Defense Counsel

*Spending Funds from Louisiana Federal Credit Union Account*

Between January 1, 2016 and February 6, 2018, **ROBERTSON**'s account received over $40,000 in deposits from WePay, which reflect donations made through GoFundMe. The starting balance on January 1, 2016 was approximately $54.25, and the ending balance on February 6, 2018 was $671.77. There were also deposits from other sources, but over that time period, $49,297.91 was withdrawn from casinos, which is more than the entire amount of all non-WePay deposits. Specifically, **ROBERTSON** withdrew $44,181.25 from the Treasure Chest Casino in Kenner, $413.95 from the Boomtown Casino, in Harvey, and $4,702.71 at Harrah's in New Orleans. In addition, the records revealed regular expenditures at grocery stores, gas stations, and other retail establishments, such as Home Depot, McDonald's, and Walmart. Moreover, except for some minimal expenses regarding events that It Take Lives hosted, there were no legitimate charitable expenses related to either paying medical expenses for Juvenile-1 or for raising awareness regarding organ donation.

On several instances, the account balances show that **ROBERTSON** withdrew cash shortly after a large deposit of charitable funds from WePay. For example, on November 22, 2016, the account balance at that time was $29.57, until WePay deposited $6,072.78. After the deposit, **ROBERTSON** made a cash withdrawal in the amount of $3,022.00, and then the next day, he made withdrawals at the Treasure Chest Casino totaling $1,425.95. There were no other intervening deposits during this time frame.

Similarly, on June 2, 2017, the balance at that time was -$11.34, until WePay deposited $7,765.55. After the deposit, the account made a $362.18 purchase at Foot Action in Kenner, and a $604.99 withdrawal at an ATM at the Treasure Chest Casino. On June 5, 2017, he withdrew

AUSA
Defendant
Defense Counsel

$604.99 at an ATM at the Treasure Chest Casino. No other deposits were made into the account during that time period.

*Regions Bank Transactions and Donated Checks*

**ROBERTSON** maintained an account at Regions Bank registered to It Takes Lives. **ROBERTSON** was the sole signatory for the account. From approximately November 1, 2016, when the account was opened, to November 20, 2017, when the bank account was closed, there were approximately $149,808.00 in deposits to the account, including a check from a local hospital ("Victim-3") for $20,000, a check from an individual associated with the NFL ("Victim-4") for $25,000, and an individual associated with the Saints ("Victim-5") for $25,000.

**ROBERTSON** spoke at an "internal leadership meeting" at Victim-3 on January 20, 2017. During the meeting, the CEO of Victim-3 brought **ROBERTSON** and Juvenile-1 onto the stage. **ROBERTSON** stated that he operated a charitable organization, It Takes Lives, and that funds donated to the organization would be used to promote awareness of organ donation. The CEO announced during that Victim-3 would make the $20,000 donation to It Takes Lives. The funds were provided to It Takes Lives for their charitable purpose.

On February 14, 2017, when Victim-3's $20,000 donation was deposited into the Regions Bank account, the balance was -$285.40. After the deposit, the balance was $19.714.60. On February 16, 2017, **ROBERTSON** made a purchase at the Home Depot for $34.91, and withdrew approximately $400 in cash at ATMs in LaPlace and New Orleans. Later that day, he withdrew $1,500 in cash. Three days later, he withdrew another $300 from an ATM in LaPlace, and then $730.95 at the Treasure Chest Casino. He also spent funds at Walmart, Home Depot, and a seafood restaurant in New Orleans. No other funds were deposited into the account during that period.

AUSA _____
Defendant _____
Defense Counsel _____

On August 14, 2017, before Victim-4's $25,000 donation, the account balance was -$191.56, and after the deposit, the balance was $24,808.44. Between August 16 and August 24, 2017, $23,903.77 was withdrawn or spent via debit card from the account, including $3,446.75 from the Treasure Chest Casino and $546.21 at the Harrah's Casino in New Orleans. Besides a $169.32 deposit from PayPal on August 18, 2017, no other deposits were made to the account during that timeframe. Victim-4, as well as another employee of the NFL who helped to arrange the $25,000 donation, believed that the purpose of the donation was to pay for Juvenile-1's medical expenses.

On August 25, 2017, before Victim-5's donation, the account balance was $1,073.99. After the deposit and **ROBERTSON**'s withdrawal of $3,000 in cash, the balance was $23,073.99. On August 25, 2017, **ROBERTSON** paid $90 at Cricket Wireless, withdrew $600 from an ATM in Kenner, Louisiana, and withdrew $626.95 at the Treasure Chest Casino. An employee of the Saints, who helped to arrange for the donation on behalf of Victim-5, visited the GoFundMe campaign, and upon review of the website, understood that **ROBERTSON** was accepting donations to pay for Juvenile-1's medical expenses. A check was then issued from the account of Victim-5. The memo line on the check states, "[Juvenile-1]'s Medical Expenses."

*Treasure Chest Casino*

**ROBERTSON** holds an Emerald Club membership at the Treasure Chest Casino, which was established on March 6, 2006. Since 2006, **ROBERTSON** has an estimated net loss of approximately $151,284 at the Treasure Chest Casino, the vast majority of which was lost at table games. In 2018, **ROBERTSON** lost $12,761. In 2017, he lost $25,266, and in 2016, he lost $37,719. Between November 28, 2015 and March 4, 2018, **ROBERTSON** charged $68,207.78

AUSA _JLS_
Defendant
Defense Counsel

on a credit/debit card at Treasure Chest Casino, which reflected $65,300 in withdrawals and the remainder in fees. Of that, $66,238.98 was withdrawn after October 18, 2016, after the GoFundMe campaign was established.

*Medical Billing Records for Juvenile-1*

Juvenile-1 was a Medicaid beneficiary and showed an extensive claims history related to various medical treatments from January 2, 2013 to August 16, 2018. All medical treatments between May 28, 2015 to January 11, 2019, were paid for by Medicaid or were removed by the billing department of Victim-3. No expenses for medical treatments were incurred by Juvenile-1 or **ROBERTSON**. **ROBERTSON** never contributed to Juvenile-1's medical costs or related expenses.

*October 24, 2018 Interview of **ROBERTSON***

On October 24, 2018, DEA interviewed **ROBERTSON** after executing a search warrant at his home and the It Takes Lives office. During the non-custodial interview, **ROBERTSON** denied utilizing any funds received as contributions to It Takes Lives to pay personal expenses or on gambling. **ROBERTSON** tried to explain his income as the result of construction work.

*Interstate Wire Communications*

The below chart describes several interstate wire communications that **ROBERTSON** caused to be sent in furtherance of the scheme to defraud:

|   | Date | Underlying Transaction |
|---|------|------------------------|
| 1 | 10/19/16 | Donation by Victim-1 to GoFundMe of $20 |
| 2 | 11/21/2016 | GoFundMe payment of $5,993.21 |
| 3 | 2/14/2017 | Check for $20,000 (Victim-3) |
| 4 | 5/31/2017 | GoFundMe payment of $8,390 |
| 5 | 6/1/2017 | GoFundMe payment of $7,726.89 |

AUSA
Defendant
Defense Counsel

| 6 | 6/5/2017 | GoFundMe payment of $1,000 |
| 7 | 7/13/2017 | GoFundMe payment of $5,000 |
| 8 | 7/14/2017 | GoFundMe payment of $5,801.49 |
| 9 | 8/14/2017 | Check for $25,000 (Victim-4) |

Donation by Victim-1: Victim-1's initial GoFundMe donation occurred on or about October 19, 2016, when he was located in the New Orleans area. GoFundMe does not maintain any servers in the state of Louisiana. Victim-1's donation thus caused an electronic signal to be transmitted by wire from the Eastern District of Louisiana to a server outside of Louisiana.

Withdrawal from GoFundMe: The WePay records also showed 131 electronic wire transfers of GoFundMe proceeds between November 21, 2016 and January 5, 2018, made to **ROBERTSON**'s Louisiana Federal Credit Union account, totaling approximately $41,474.87. They include the following transfers, which are included in the chart above: (1) a payment on November 21, 2016 of $5,993.21; (2) a payment on June 1, 2017 of $7,726.89; and (3) a payment on July 14, 2017 of $5,801.49. The WePay accounts used to distribute GoFundMe funds are maintained at Fifth Third Bank, which does not have any branches in Louisiana, and all of WePay's outbound wire transfers of funds to **ROBERTSON** originated outside of Louisiana.

Deposits to LCFU: Any out-of-state wires or transfers to a Louisiana Federal Credit Union account pass through a server in Plano, Texas, and the funds are then deposited to the recipient's Louisiana Federal Credit Union account. Every time a Louisiana Federal Credit Union account receives a wire or transfer from out of state, a server in Plano, Texas sends an electronic communication to Louisiana Federal Credit Union, which is located in LaPlace, Louisiana. Accordingly, every time that a WePay deposit was made into **ROBERTSON**'s Louisiana Federal

AUSA
Defendant
Defense Counsel

Credit Union account, it caused an electronic communication between a server in Plano, Texas and a Louisiana Federal Credit Union server in LaPlace, Louisiana.

<u>Checks to Regions:</u> Regions Bank, where the checks from Victim-3 and Victim-4 were deposited, maintains its servers in Alabama. Every time that **ROBERTSON** deposited or withdrew funds in the New Orleans area, it caused an electronic communication to be issued from the New Orleans area to the Regions Bank servers in Birmingham, Alabama, after which the check was electronically transmitted to the Federal Reserve Bank of Atlanta for processing.

For purposes of sentencing, the government and the defendant stipulate that the amount of loss resulting from defendant's scheme to defraud was between $95,000 and $150,000.

This proffer of evidence is not intended to constitute a complete statement of all facts known by **ROBERTSON**, but rather is a minimum statement of facts intended to prove the necessary factual predicate for the guilty plea. The limited purpose of this proffer is to demonstrate that there exists a sufficient legal and factual basis for **ROBERTSON** plea of guilty to these crimes.

**READ AND APPROVED:**

_____     8/29/19
JONATHAN L. SHIH                    (Date)
NICHOLAS D. MOSES
Assistant United States Attorneys

_____     8/14/19
MICHAEL BELL                        (Date)
Attorney for Defendant

_____     8/14/19
JORDY ROBERTSON                     (Date)
Defendant